IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case. No.   C-3-99-093** |
| | ) | |
| UNITED TECHNOLOGIES CORPORATION | ) | |
| | ) | **Judge Thomas M. Rose** |
| Defendant. | ) | |
| _____ | ) | |

## THIRD AMENDED COMPLAINT

The United States of America, by and through counsel, alleges as follows:

### Introduction

1.      The United States of America brings this civil action against United Technologies

Corporation ("UTC") to recover its damages and civil penalties under the False Claims Act (31

U.S.C. §§ 3729-33, as amended, ["FCA"]), and its damages under contract, payment under

mistake of fact, and unjust enrichment, resulting from the acts and knowing false claims and

statements made by UTC's Pratt & Whitney division ("Pratt") to the United States Air Force.

The exhibits nos. 1-9 referred to herein are attached to the original and Amended Complaint and

are incorporated herein by reference.

2.      This matter arises from Pratt's knowing false certifications, non-disclosures, and

 active concealments during and after its negotiation and performance of the multi-billion dollar

Alternate Fighter Engine Contract (F33657-84-C-2014) (alternately, the "AFE Contract,"

"Contract," or "Procurement") by which the Air Force purchased F100-220 jet engines during

Fiscal Years 1985-90 to power F-15 and F-16 fighter jets.  In its Best and Final Offer ("BAFO") submitted in the AFE Procurement, Pratt knowingly, falsely certified that its prices "reflect[] our best estimates and/or actual costs" based on its review and evaluation of subcontractor proposals exceeding $100,000 when, in fact, they were based on inflated and false estimates.  Pratt also knowingly submitted two false certifications required under the Truth In Negotiations Act, 10 U.S.C. S 2306(f) ("TINA"), and the Defense Acquisition Regulation ("DAR"), 32 C.F.R. § 3-807, that it had submitted accurate, complete and current cost and pricing data in support of its proposal, and its BAFO.  Pratt knew at the time of submission that the Air Force would rely on Pratt's Certificate of Current Cost or Pricing Data.

3.     The Air Force relied on Pratt's false certifications that its BAFO engine prices were supported by accurate, complete and current cost or pricing data, relied on Pratt's submitted cost or pricing data, and accepted Pratt's BAFO engine prices as fair and reasonable.  Although Pratt's BAFO prices were later reduced by an economic price adjustment provision of the Contract, and by Pratt's voluntary price reductions, Pratt's submission of inflated prices nevertheless resulted in it overcharging the Air Force on the AFE Contract by at least approximately $141 million.

4.     The United States, despite exercising reasonable diligence in administering and auditing the Contract, did not learn of Pratt's fraud, alleged below, until, at the earliest, the summer of 1997.  By operation of 31 U.S.C. § 3730(b)(2), and tolling agreements between the parties, the United States may recover its FCA damages and statutory penalties resulting from Pratt claims submitted to or paid by the government on or after March 3, 1989.  By operation of 28 U.S.C. §§ 2415 and 2416, and tolling agreements between the parties, the United States may

recover its full common law damages arising from all claims submitted in Pratt's performance of the AFE Contract.

## Jurisdiction and Venue

5.     This Court has jurisdiction under 28 U.S.C. § 1345.

6.     Venue is proper in this district under 31 U.S.C. § 3732(a) because the defendant transacts business in this district, and because many of Pratt's acts proscribed by 31 U.S.C. § 3729 occurred at Wright-Patterson AFB in this district.

## Parties

7.     The plaintiff is the United States of America, which is suing on behalf of the Department of Defense ("DOD") and the Department of the Air Force ("Air Force"), both agencies and instrumentalities of the United States government.  DOD's operations and obligations are paid by funds from the United States Treasury.

8.     Defendant United Technologies Corporation ("UTC") is a corporation organized and existing under the laws of Delaware with its headquarters in Hartford, Connecticut.  At all relevant times, Pratt & Whitney ("Pratt") has been an operating division of defendant UTC, with principal headquarters and facilities in Connecticut and Florida.  Defendant UTC, and its Pratt division in particular, transact substantial business in this district.

## Statement of Facts

### A.   The Alternate Fighter Engine ("AFE") Procurement

9.     From the early 1970's and continuing through 1982, Pratt was the sole

manufacturer and supplier to the Air Force of high-performance jet engines used in F-15 and F-16 fighter aircraft.  Increasingly, the Air Force became dissatisfied with the high purchase, maintenance, and spare parts costs of Pratt's engine, and sought to have the General Electric Company ("GE") become an alternative supplier of F-15 and F-16 jet engines.

10.     In December, 1982, the Air Force provided Pratt and GE with a draft Request for Proposal F33657-83-R-0105 ("draft RFP") for a Source Selection, negotiated procurement of more than 2,000 jet engines, with deliveries during Fiscal Years 1985-90.  The draft RFP contained proposed text describing the characteristics of the engines and equipment planned to be purchased, the criteria to be used in awarding contracts to one or both contractors, and applicable procedures, including that:

    a.      The procurement would be conducted under the Source Selection procedures in Air Force Regulation 70-15.

    b.      The procurement would be negotiated, not competitive, and the contractors would be required to support their proposals with certified cost and pricing data.

    c.      The proposals would be evaluated on the basis of four criteria that, in descending order of importance, were 1) overall capability, 2) readiness (logistics) and support, 3) engine life-cycle cost (acquisition costs plus operations and support costs for 20 years), and, 4) program adequacy and competition, i.e., manufacturing and support capability, competition in sourcing spare parts, and co-production.

- 4 -

      d.      The Air Force would assess the effect of selecting either sole or dual-sources based on considering the acquisition and ownership costs, system readiness and availability, and industrial mobilization base.

      e.      The Air Force reserved the right to award a contract on other than the lowest proposed acquisition price.

11.      On May 18, 1983, the Air Force issued RFP F33657-83-R- 0105 ("RFP") after considering the responses from Pratt and GE to the draft RFP. The RFP was unchanged in the pertinent respects recited in Paragraph 10, above.

12.      On May 18, 1983, the Air Force Assistant Secretary for Research, Development and Logistics determined and found under 10 U.S.C. § 2304(a)(16) that, in order to promote the industrial mobilization base, contracts resulting from the RFP would be negotiated rather than advertised.

13.      Because the AFE procurement would be a negotiated rather than advertised procurement, each contractor was required under DAR § 3-807.3 to "submit, either actually or by specific identification in writing, cost or pricing data in support of [its] proposal." Exhibit 1.

14.      At the time of the AFE Procurement, "cost or pricing data" was defined in DAR § 3.807.1(a)(1) as follows:

> Cost or pricing data consists of all facts existing up to the time of agreement on price which prudent buyers and sellers would reasonably expect to have a significant effect on price negotiations. Cost or pricing data embraces more than historical accounting data. It also includes such factors as all vendor quotations, nonrecurring costs, changes in production methods and production or procurement volume, data in support of contractor projections of business prospects and objectives, together with related costs of operations, unit cost trends such as those associated with labor efficiency, make-or-buy decisions and estimated resources to attain business goals and any other management decisions which reasonably

> could be expected to have a significant bearing on costs under a proposed
> contract, e.g., the comparative analysis by which a particular vendor was
> selected.  In short, cost or pricing data consist of all facts which
> reasonably can be expected to contribute to sound estimates of future costs
> as well as to the validity of costs already incurred.  Cost or pricing data,
> being factual, are that type of information which can be verified.

15. In August 1983, and in response to the RFP, Pratt and GE each submitted their confidential, certified initial proposals for the AFE Contract.  The proposals were submitted with DD Forms 633 and were supported with cost or pricing data.

16. Government analysts and auditors separately reviewed the Pratt and GE proposals, and the related cost or pricing data.  They objected to Pratt supporting its estimated material costs with ceiling-price quotes -- "not-to-exceed" prices -- from sole-source vendors. These ceiling price quotes, primarily for major parts and assemblies, would later be negotiated and result, typically, in lower priced purchase orders.  Material estimates based on ceiling prices comprised one of the largest cost elements in Pratt's proposal.

17. Pratt's material estimates in  its August, 1983 proposal ignored its past experience negotiating lower prices with its vendors, and ignored that its Procurement Cost Accounting Group ("PCAG") had or would review the proposed ceiling quotes and recommend lower prices. Pratt's PCAG personnel were charged with responsibility under DAR § 3-807 to review, evaluate, and provide the basis for establishing the reasonableness of sub-contractor proposals over $100,000.  Plaintiff alleges that at the time of the AFE procurement, PCAG had significant responsibilities in Pratt's analysis and negotiation of purchase orders.

18. In October, 1983, government analysts and auditors separately met with each contractor to resolve questions about the initial proposal, and its strengths and weaknesses. Under Source Selection procedures, these meetings are variously described as "fact-finding" or

"negotiations."  With regard to Pratt's use of ceiling price quotes to support its proposal, the analysts and auditors recommended that Pratt adjust (or decrement) those ceiling quotes consistent with PCAG-recommended prices.  Mr. Roger Skemp, a representative of Pratt, attended the fact-finding discussions with representatives of the Air Force.  Mr. Skemp's notes from the fact-finding discussions reflect that someone from the government stated to Pratt, with respect to ceiling quotes, "Quotes basically ok but need to assume some reasonable negotiation decrements for ceilings."

19.     On November 11, 1983, the Air Force provided Pratt with a document titled "Contractor Inquiry" that summarized the fact-finding discussions, and instructed Pratt to address "the disposition of all PCAG recommendations in BAFO."

20.     On November 19, 1983, the Air Force provided Pratt and GE "BAFO Instructions," and directed each to "specifically address[]" the issues discussed during fact-finding and summarized on November 11, including, 1) whether and to what extent each government exception to their proposal was incorporated into the BAFO, 2) the price impact and the cost element impacted by each such incorporation, and, 3) a written rationale for the treatment given each exception.   These instructions were intended to allow the Air Force BAFO evaluators to track each contractor's implementation of government-recommended changes in the BAFO, and to evaluate changes in costs from the initial proposal to the BAFO.

21.     Pratt submitted its BAFO to the Air Force on December 5, 1983, with its engine prices set out on DD Forms 633.  On the DD Forms 633 Pratt certified that its proposal was submitted in response to the RFP and "reflects our best estimates and/or actual costs as of the date in accordance with the instructions of this form".  Exhibit 2.  The prices Pratt proposed in its

- 7 -

BAFO were a sum of its purported "best estimates" of expected costs plus a 15% profit. The referenced DD Form 633 Instructions required Pratt, for each sub-contract over $100,000, to provide the "basis of establishing ... reasonableness of price, as well as results of review and evaluation of subcontract proposals when required by DAR 3-807". Exhibit 2, Instructions, Paragraph 1, "Subcontracted Items." Paragraph 7.A.(1) of the Instructions further required Pratt to "[e]nter those necessary and reasonable costs that in offeror's judgment will properly be incurred in efficient contract performance." Pratt recognized that in executing the DD Forms 633 as part of its BAFO, it was representing to the government that it knew of no facts that made the BAFO estimate unjustifiable, but that there were facts that justified that estimate. Pratt also knew that the government would rely on its representations.

22.    In Section 3.8 ("Explanation Exhibits") of its BAFO, Pratt provided additional explanations of its BAFO proposal. In Exhibit 3.8.1 ("Fighter Engine Competition: Initial to BAFO Cost Tracking"), Paragraph A.1, Pratt stated that it had developed and applied a ceiling quote decrement factor in the BAFO based on "PCAG recommendations for each supplier and the cognizant buyer's past experience with the individual vendors involved". Exhibit 3. Pratt further stated that it had not "solely" used PCAG-recommended price reductions in developing its decrement because of its "past experience in not being able to achieve PCAG recommendations at final settlement time." Pratt's representations were submitted in ostensible compliance with the November 19 BAFO Instructions described in Paragraph 20, above.

23.    In support of its BAFO, Pratt also submitted Item #8 of its "Category I Disclosure Data," a chart titled "Decrement Factors," that, according to Pratt, displayed "a summary by vendor for PCAG recommendations and Purchasing buyer assessments of decrement factors for

ceiling type quotes," and "data ... considered in estimating standard material" for Pratt's proposal. Exhibit 4.

24.     In a letter to the Air Force Contracting Officer, Mr. Gary Hansman, that accompanied its BAFO, Mr. J. G. O'Connor, Senior Vice President at Pratt's Government Products Division, represented that Pratt's BAFO was "compliant with all requirements" of the November 19, 1983 BAFO Instructions.

25.     In ostensible compliance with DAR § 3.807.6(a), Pratt submitted a "Certificate of Current Cost or Pricing Data," to the Air Force on January 3, 1984 for its initial proposal (Exhibit 5), and a separate Certificate on January 11, 1984, for its BAFO (Exhibit 6). On the two documents, Mr. R. J. Jones, Director of Contract Management at Pratt's Government Products Division, certified that Pratt had submitted cost or pricing data "accurate, complete and current as of December 5, 1983."

26.     The Air Force reviewed Pratt's BAFO and DD Forms 633, and determined they were "traceable to cost support data which was accepted as valid," as reported in a December 23, 1983, "Record of Acquisition Action." Exhibit 7. The Air Force further concluded:

> In addition to the face to face discussion of issues, the significant comments from the DCAA/AFPRO reports were sent to the contractor in the form of a Contractor Inquiry (CI) with responses due as part of the BAFO. The BAFO contained responses to these comments in sufficient detail to allow the AFET [Air Force Evaluation Team] full visibility into the cost impact of those responses with supporting rationale to justify the Offeror's treatment of each comment in the BAFO.

27.     Air Force personnel separately evaluated Pratt and GE BAFOs against the

- 9 -

specified, weighted selection factors, and reported their findings to the Source Selection Authority.  The BAFOs received nearly equivalent ratings at the full-award level, although Pratt's BAFO received significantly lower evaluations at less than full-award.

28.     A.     The Air Force official with the responsibility to determine whether to accept Pratt's BAFO prices as fair and reasonable was the Contracting Officer.   The Air Force acting through the Contracting Officer, and relying upon the above representations and information, accepted Pratt's BAFO prices as fair and reasonable.

B.     The Source Selection Authority (SSA) for the AFE procurement was the Secretary of the Air Force.  The SSA did not have the authority to determine reasonableness of prices, but only whether Pratt and GE would be awarded contracts for engines and in what amounts.  On February 3, 1984, after considering the various evaluations of the BAFOs, the Secretary split the FY 1985 award so that Pratt received 25%, and GE 75%, of the total.  The Secretary deferred a decision on future award percentages, and whether awards would be for single or multiple years.

B.     Pratt's Knowing False Representations

29.     Pratt certified, on Forms DD 633 that it submitted as part of its BAFO, that its proposal "reflect[ed its] best estimates and/or actual costs as of the date in accordance with the instructions of this form".  Exhibit 2.  Pratt's "best estimates" certifications were false because the  "Purchasing Decrement[s]" were factually unsupportable.  Pratt presented in its BAFO Disclosure Item # 8, and ostensibly used to price the engines sold to the Air Force under the Contract, had no basis in fact, and as such could not be 1) Pratt's "best estimates" of its expected vendor costs under the terms of the referenced Instructions to the Forms DD 633, and/or 2) an

"accurate" representation of Pratt's expected negotiated reduction to its ceiling quotes.  The "Purchasing Decrement[s]" also were not consistent with Pratt's history of achieving PCAG recommendations at final settlement time, or its past experience with the vendors, contrary to the representation of Pratt's BAFO Exhibit 3.8.1., paragraph A.1.

> 1. Pratt Misrepresentations in BAFO Exhibit 3.8.1 A.1 About Its Development of Decrements and Their Application to Ceiling Price Quotations, and BAFO Exhibit 3.8.1.C.3 about Its Use of the Most Current Quotes Available.

30. A. In its BAFO Exhibit 3.8.1, Pratt purported to describe the method it used to determine the "decrement factor", and justify why it had not applied the PCAG-recommended prices suggested by the government during Source Selection negotiations.  However, Pratt knowingly understated the appropriate decrements, and the following statements from BAFO Exhibit 3.8.1, paragraph A.1. are knowingly false:

> a. "Ceiling price quotes were decremented in the BAFO for consideration of final settlement on all sole-sourced vendors[.]"

> b. the decrement factor was "developed based upon our review of the PCAG recommendations for each supplier and the cognizant buyer's past experience with the individual vendors involved;"

> c. "[t]he decrement factor reflects our past experience in not being able to achieve PCAG recommendations at final settlement time;"

> d. "[w]hile we have incorporated a decremented position, we do not agree that the appropriate estimate should be based solely upon PCAG, but rather also should consider past experience by supplier as indicated above."

Exhibit 3, emphasis supplied.

B. Pratt's "decrement factor[s]" ignored its history of substantially meeting (and, in some cases exceeding) the PCAG- recommended price reductions for several vendors in the

-11-

previous 23 months, including Rohr, Hamilton-Standard-Electronic, Hamilton-Standard-Environmental, Hamilton-Standard-Aerospace, Ex-Cell-O-Zeeland; and UAP.

       C.     Pratt never applied a decrement to the Ceiling price quotes for the most expensive engine parts from vendors, the Digital Electronic Engine Control ("DEEC"). In pricing its BAFO, Pratt used older ceiling purchase orders that were not the subject of the "PCAG Recommendation[s]" reported on Item #8, and to which it had not applied the vendor-specific "Purchasing Decrement" listed on Item #8. Pratt's action overstated the reasonable, estimated cost of the DEEC parts in the BAFO engine prices.

       D.     Pratt applied the understated and erroneous decrements presented in BAFO Disclosure Item #8 to a Quoted Bill of Materials for a jet engine that Pratt would not be manufacturing and selling under the Contract, and that contained vendor quotes for material that would not be used. At the time of the BAFO submission, members of Pratt's New Engine Pricing Group at East Hartford recognized that this method inflated the BAFO prices. During the post-award audit, Pratt personnel again recognized that this method inflated the BAFO prices.

       E.     Additionally, Pratt represented in BAFO Exhibit 3.8.1, paragraph C.3, that it had incorporated its most current quotes into its BAFO. It wrote in part: "[a]ll remaining engineering change deltas were adjusted to reflect latest data available. This includes most current quotes, most current engineering changes...." This representation was knowingly false because Pratt had not used or incorporated into the BAFO its most current -220 ceiling price quotes, *i.e.*, the specific quotes obtained by Pratt for the Fighter Engine Competition proposal in the quantities and years of delivery responsive to the RFP and summarized for each of the three

options in the 6/23/83 F100 Multiyear Competition Proposal Bills of Material 1986-1990 F100-220 Engine. Pratt's action overstated the reasonable, estimated costs of these parts.

    2.    <u>Pratt's Misrepresentations in BAFO Disclosure Item #8</u>

31.    A.    In Item #8, Pratt listed "Purchasing Decrement" factors (the right-hand column) that were substantially lower than was warranted by the actual "past experience" of Pratt Purchasing Department achieving PCAG-recommended prices in negotiations with the listed vendors.

    B.    The decrement factors Pratt presented in BAFO Disclosure Item # 8 were not based upon accurate, complete and current data, did not reflect Pratt's "best estimates" and were factually unsupportable. The decrements disregarded and did not use updated cost data Pratt had obtained from its largest vendor, Bendix, and from other vendors such as Howmet-Misco. The decrements presented disregarded reasonable price reductions recommended by Pratt's PCAG based on 1) excessive profit proposed by vendors such as Bendix, Howmet-Misco, Sherwood Metal Products, Simmonds and Tre-Astech, 2) excessive escalation proposed by vendors such Ex-Cell-O-Zeeland, Rohr, Simmonds, UAP, and Tre-Astech, and, 3) ignored already negotiated overhead rates with respect to Hamilton-Standard-Electronic, Hamilton-Standard Environmental, and Hamilton-Standard-Aerospace. Pratt's decrement for Ex-Cell-O-Zeeland also ignored that the PCAG-recommended reduction reflected lower costs Excello would incur because of newly developed sources for parts.

    C.    Pratt's statement in the explanation to BAFO Disclosure Item #8 that the "PCAG recommendations" and "Purchasing buyer assessments of decrement factors" presented

-13-

on Item #8 were "considered in estimating standard material for the Fighter Engine Competiton BAFO" was misleading.

D.    Pratt also understated by nearly 60% on BAFO Item #8 (Exhibit 4) the PCAG-recommended ceiling price reduction for Bendix, Pratt's largest BAFO vendor.  On Item #8, Pratt listed 4.3% as the PCAG-recommended price reduction, when, in fact, PCAG had recommended a 6.9% overall price reduction.  Pratt also understated the "PCAG Recommendation" on Item #8 for the following suppliers:  Hamilton Standard- Electronics; Sherwood Metal Products; Armtec; and, Simmonds.  Pratt also wholly-omitted one of its BAFO vendors, TRE-Astech from the Item #8 presentation of "PCAG Recommendation[s]" and "Purchasing Decrement[s]."  One effect of Pratt's multiple understatements of the size of the PCAG-recommended price reductions was to make its still smaller BAFO reductions appear more reasonable.

3.    Pratt's failure to produce data bases and describe the significance of the data

32.    A.    At the time Pratt personnel developed the proposed BAFO engine prices, and prepared BAFO Disclosure Item #8, Pratt had a computer data base, from which it could have readily retrieved and provided to the Air Force its Purchasing Department's actual "past experience" sustaining or achieving PCAG-recommended price reductions in negotiations. Pratt's data base produced reports titled "Procurement Cost Analysis; Jobs Negotiated; Year to Date," that were marked "Confidential," and that separately described, by vendor, product line, and PCAG employee, the ceiling price analyzed, the PCAG-recommended price, the price negotiated, negotiated savings, and "savings percent."  Exhibit 8 to the Complaint is one report from the data base, as of January 4, 1983.  Pratt's Manager of New Engine Pricing, the office that

-14-

prepared the bulk of the BAFO estimate, has acknowledged that the PCAS data base was evidence of Pratt's "past experience" achieving PCAG recommendations in negotiations with its vendors.

        B.     At the time Pratt personnel developed the proposed BAFO engine prices, and prepared BAFO Disclosure Item #8, Pratt had a computer database titled "Ceiling Order (W) Decrement System" from which was created Report No. 31088 that Pratt contemporaneously described as displaying for ceiling orders, "estimated reductions by detail part listing, by product line." Based on similarities in Pratt's contemporaneous description of the Report 31088 and Pratt's 1983 procedures for setting material cost standards, and other evidence, plaintiff alleges on information and belief that Report 31088 was part of Pratt's financial accounting system that reported the price reductions Pratt expected to receive from pending negotiation of ceiling purchase orders with its material, such as those providing the high-value parts for the DEEC.

        C.     Pratt also did not disclose to the Air Force the significance of the data in the PCAS database, nor did it provide the Air Force with related reports. These reports could have revealed that the decrement factors presented in BAFO Disclosure Item #8 were inaccurate, were not representative of Pratt's "past experience ... being able to achieve PCAG recommendations at final settlement time," and were both unsupported by known facts and inconsistent with the facts and transactions reported in the databases.

        D.  Pratt failed to disclose to the Air Force or DCAA the significance to Pratt's BAFO pricing of a "Report 31088" from its Financial Reporting System. Pratt's non-disclosure was significant because Report 31088 presented, as part of Pratt's financial accounting system,

anticipated price reductions on ceiling purchase orders, such as those Pratt used to price the DEEC in its BAFO estimate.

### 4. Pratt Misrepresentations in BAFO Exhibit 3.8.1.A.2, A.3, and C.3

33.    A.    Pratt acknowledged in BAFO Exhibit 3.8.1., paragraph A.2, that it did "not take exception" to government findings that it had "mechanical errors" on supporting quote data for, among others, part no. 4061493, and falsely stated that it had "incorporated appropriate consideration for these in the BAFO." Instead, Pratt did not change erroneous estimated costs for part no. 4061493 in the BAFO – among the most costly in the engine.

B.    Pratt misrepresented in BAFO Exhibit 3.8.1., paragraph A.3, that the escalation it had applied to base type quotes in the BAFO "reflect[ed] consideration for the most recent DRI forecast of the appropriate indices." Instead, Pratt applied only 75% of the newer, lower DRI forecast.

C. Pratt represented in BAFO Exhibit 3.8.1, paragraph C.3, that it had adjusted cancelled parts to reflect 1984 dollars as the basis instead of 1983 dollars escalated. It did not.

D.    These misrepresentations significantly increased the amount by which Pratt was able to inflate the prices to the Air Force of the jet engines sold under the Contract.

### 5. Additional False Representations and Inflated Engine Prices in BAFO

34.    The two "Certificate[s] of Current Cost or Pricing Data," Pratt submitted to the Air Force on January 4 and 11, 1984, each contained a knowing false statement that Pratt had submitted accurate, complete and current cost or pricing data in support of its initial proposal (Exhibit 5) and in support of its BAFO (Exhibit 6). In fact, Pratt officials withheld data and

-16-

documents reporting Pratt's actual "past experience" negotiating PCAG-recommended prices, and, instead, had submitted false data that significantly inflated Pratt's stated costs.

35.     Pratt's DD Forms 633, on which it submitted its BAFO prices, contained knowing false statements that Pratt's BAFO engine prices reflected Pratt's "best estimates and/or actual costs" and "necessary and reasonable costs that in offeror's judgment will properly be incurred in efficient contract performance." Exhibit 2 to the Complaint. In fact, Pratt's BAFO engine prices had been inflated by its knowing use of overstated cost estimates for material from sole-source vendors.

36.     As a result of Pratt's knowing acts and omissions described herein, its BAFO material costs were inflated as were its engine prices. These inflated prices were accepted by the Air Force in the Contract, and formed the basis for inflated payments made by the United States to Pratt. Had Pratt proposed in its BAFO, prices that were not based upon false and inflated cost estimates, it would have been those lower prices that the Air Force would have accepted and paid.

6.     Pratt's Multiple False Statements in BAFO Exhibit 3.8.1, in BAFO Disclosure Item #8, in its Forms DD 633, and in its Certificates of Current Cost or Pricing Data Were Made With Full Knowledge of Their Falsity

37.     A. Pratt had actual knowledge of the falsity of its representations in BAFO Exhibit 3.8.1, in BAFO Disclosure Item #8, in the DD Forms 633 in the BAFO and in its Certificate of Current Cost or Pricing Data; alternatively, it acted with reckless disregard or deliberate ignorance as to those false statements.

B. Pratt's New Engine Pricing Group in its Hartford, CT. Manufacturing Division, had primary responsibility to prepare the material cost estimates for the BAFO. In

preparing such estimates, they were required under applicable procedures to use accurate data, to confirm the accuracy of that data, and to preserve the data and work papers they used.   Despite that obligation, members  of the New Engine Pricing Group who prepared the BAFO, including the manager, Mr. Donald Nichols, who drafted the first page of  BAFO Disclosure Item # 8 and BAFO Exhibit 3.8.1.A.1  had no direct knowledge how the Item #8 "Purchasing Decrement[s]" were developed when they prepared for submission to the Air Force: (1) the material cost estimates, and (2) BAFO Disclosure Item #8.  They made no effort to determine the accuracy of BAFO Disclosure Item #8 and the "Purchasing Decrement[s]," and, instead, <u>ostensibly</u> applied the "Purchasing Decrement[s]" to their estimated material costs without analysis.  Pratt's Value and Financial Analysis Group provided the  "Purchasing Decrements" to New Engine Pricing, based on, they claim, information received from Pratt's Purchasing Managers.   The Purchasing Managers have no recollection of providing such data.  Additionally, members of Pratt's Value and Financial Analysis Group claim not to have known how the BAFO Disclosure Item # 8 "Purchase Decrement[s]" were developed.

C.    Pratt's Fraudulent Concealment of Its Misrepresentations,<br>
<u>Plaintiff's Non-Discovery Despite Due Diligence, and Tolling</u>

38.    After knowingly submitting an inflated BAFO and withholding accurate, complete and current cost or pricing data during the AFE Procurement, Pratt 1) concealed its prior misrepresentations and non-disclosures, 2) continued to withhold cost or pricing data requested and sought by the government in a post-award audit, and, 3) made additional, affirmative misrepresentations to the government in support of its prior fraud.

-18-

　　　　　1.　　Continuing non-disclosure of cost or pricing data and
　　　　　　　　 <u>affirmative misrepresentations during DCAA's audit.</u>

39.　　Beginning in 1989, the Defense Contract Audit Agency ("DCAA") of the DOD commenced an audit analysis of Pratt's submissions resulting in the AFE Contract to determine whether Pratt had failed to submit accurate, complete and current cost or pricing data, and, if so, whether an administrative price reduction was warranted under the Contract's provisions.  This type of audit is known as a "defective pricing, post-award audit" and is typically performed in large-dollar, negotiated procurements.

40.　　The audit was authorized and performed under two standard government procurement clauses incorporated at Section I of the Contract:  "Price Reduction for Defective Cost or Pricing Data" [DAR 7-104.29(a)]; "Audit by Department of Defense" [DAR 7-104.41(a)].  Exhibit 9.

41.　　At all relevant times, Pratt was required under both the DAR and AFE Contract provisions to retain books, records, documents and data relating to its pricing or performance of the Contract for three years following final payment, and make those records and data available to the government.  This obligation continues to this date since there has been no final payment under the Contract.

42.　　From the start of the post-award audit, DCAA made several requests to Pratt that it provide the cost or pricing data supporting its ceiling quote decrements.  In a May 3, 1989 letter to Mr. Don Nichols, Pratt's Manager, Government Accounting and Compliance, DCAA requested that Pratt provide it with "data items supporting ... Ceiling Price Purchase Order and Quote Decrement Factor studies supporting the proposal and the most current studies available prior to 5 December 1983."  DCAA made similar, subsequent requests for data and documents

supporting Pratt's ceiling quote decrements, and related computations, on, at least, the following dates:  December 19, 1989; April 13, 1990; and, September 1, 1993.

       43.     A.     Pratt never provided DCAA post-award auditors with the reports or pertinent data from the PCAS data base reflecting its "past experience" negotiating PCAG-recommended prices with its principal vendors, and never explained the significance of that information as to the BAFO prices.  Pratt also never informed DCAA post-award auditors about the significance of Report 31088.

              B.     Pratt also never provided its work sheets, analyses and similar documents it used to develop its estimated reductions for its BAFO material costs.  Some of those documents contain the type of information that, under the BAFO Instructions, Pratt was required to furnish Air Force BAFO evaluators so they could track and evaluate Pratt's <u>actual</u> revisions in the BAFO to its August, 1983 proposed engine prices, and whether and to what extent those revisions included issues discussed between Pratt, DCAA and Air Force personnel during "fact-finding" in November, 1983.  These Pratt-withheld documents also indicated that its BAFO prices were inconsistent with its "best estimates" of its material costs.  Such Pratt-withheld documents included:  1) a complete version of the Value and Financial Analysis Report (PWEH 31 002215-30) that was inconsistent with Pratt's Exhibit 3.8.1 and its estimated material costs in the BAFO; and, 2) a file labeled "November 1983 Supporting Worksheets incl: Initial to BAFO Cost Tracking, BAFO Mgt Review PKG, Detail Worksheets, ILL Data ECP Worksheets" (PWEH 13 241-645) that contained work papers indicating that BAFO Exhibit 3.8.1 and Pratt's estimated material costs in the BAFO did not reflect its "best estimates" of the costs likely to be incurred.  Pratt also withheld these and similar documents from DCAA during its post-award

audit of the AFE Contract, despite repeated requests by DCAA for such documents. Pratt first produced the documents to the Government in the late 1990s well after completion of the DCAA audit. In addition to withholding the above-described documents, and at no time did Pratt ever inform government personnel of the facts described in paragraph 29, above.

44.     DCAA attempted to audit and evaluate Pratt's "purchasing decrement[s]" with an alternate methodology not reliant on the data and documents Pratt stated it could not provide. DCAA's alternate analysis did not investigate, evaluate or discover Pratt's misrepresentations described above. DCAA concluded that Pratt had defectively priced its BAFO material prices, and reported those conclusions to the contracting officer for his review.

45.     During and after DCAA's post-award audit of Pratt's BAFO, Pratt representatives repeated statements to the government known to be false:

> a.      In response to a DCAA request for "[s]chedules detailing quoted and
>         unquoted purchased parts..." for the BAFO, Pratt furnished DCAA on
>         March 12, 1990, an undated report titled "Fighter Engine Competition;
>         Best and Final Offer" that falsely described how Pratt developed its BAFO
>         ceiling quote decrement factors:
>
>> The SACA Report and recommendation was reviewed by the
>> cognizant buying code. Based upon the recommendation and their
>> past experience with the supplier a decrement factor was
>> developed. Attachment A [Exhibit 4 to the Complaint] reflects the
>> average rate of reduction recommended for the supplier as noted
>> by SACA and Purchasing's estimate to the decrement that will be
>> applied against the ceiling price.
>
> The statement was false because, as discussed in Paragraph 31, above,
>
> Pratt's  "Purchasing Decrement[s]"  did not reflect "their past experience

with the supplier." It also was false because the Pratt's New Engine

Pricing have claimed not to have known how the BAFO Disclosure Item #

8 "Purchasing Decrement[s]".

b.      In a February 26, 1991, letter to the Air Force, Mr. D. P. Hamilton, Pratt's

Vice President-Finance, criticized DCAA's proposed defective pricing

finding because "DCAA has not recognized the disclosed methodology of

adjusting proposed material costs ... for ceiling price decrements per

BAFO Exhibit 3.8.1 ...." Mr. Hamilton's statement was false because

Pratt had not used the described methodology to adjust ceiling price

quotes for anticipated negotiations.

c.      In June 12 and August 21, 1991 letters to the DCAA Resident Auditor at

Pratt, Mr. Don Nichols, Pratt's Manager of Government Accounting and

Compliance made misrepresentations similar to those described in

Paragraph 45.b, while criticizing DCAA's findings.

d.      In Attachment II-1 to a March 30, 1993 letter from Mr. Nichols to the

Chief, Defective Pricing Branch, Contracting Directorate, Wright-

Patterson AFB, OH, Pratt stated:

> Furthermore, Pratt & Whitney fully disclosed its methodology of
> adjusting ceiling price quotes in BAFO Exhibit 3.8.1 (attached).

e.      In a January 25, 1994 letter from Mr. Nichols to the Air Force concerning

the DCAA proposed defective pricing findings, Mr. Nichols provided the

report described in paragraph 45.a, above, describing it as

> [s]upport package prepared by Purchasing for the purchasing

-22-

decrement factors. As I explained to you, this decrement was the result of analysis of: ceiling price decrements, market conditions on competitive (non-ceiling), and escalation on base price quotations.

The representation was false and misleading for the reasons stated in paragraph 45.a, above. The contracting officer did not adopt DCAA's proposed finding that Pratt had defectively priced its BAFO material costs as it pertained to the decrements.

> 2. The government's did not discover Pratt's misrepresentations until the summer of 1997 despite its due diligence

46. The DCAA auditors who conducted the post-award audit of Pratt's BAFO never discovered Pratt's BAFO misrepresentations described above, although they exercised due diligence. Their efforts were significantly impeded by Pratt's misrepresentations described in paragraph 45, above, and by Pratt's disregard of its regulatory and contractual obligations to preserve its cost or pricing data for the BAFO for three years past final payment under the contract.

47. At no time prior to 1997 were facts material to the government's claims here alleged known, or should they have been known, by an official of the United States charged with responsibility to act in the circumstances.

48. It was not until the summer of 1997, at the earliest, that the government discovered Pratt had misrepresented its development and application of a ceiling quote decrement in its BAFO.

49. Plaintiff and defendant have executed five agreements that toll the running of time under statutes of limitations and laches on plaintiff's False Claims Act and common law claims for the period from April 27, 1998 to March 4, 1999.

-23-

**Count I**
False Claims Act
31 U.S.C. § 3729(a)(1)

50.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1), for defendant knowingly presenting or causing to be presented, false or fraudulent claims to the United States.

51.     Plaintiff re-alleges and incorporates by reference Paragraphs 1-49 of this First Amended Complaint.

52.     By virtue of the acts described above, defendant knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval, including 708 invoices (DD Forms 250) submitted by Pratt to the Air Force on or after February 24, 1989, and that the Air Force paid on or after March 3, 1989. These 708 invoices have been identified by the Plaintiff to the Defendant.

53.     The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid those claims and has been damaged in an amount to be proven at trial.

**Count II**
False Claims Act
31 U.S.C. § 3729(a)(2)

54.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(2), for defendant's knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government.

55.     Plaintiff re-alleges and incorporates by reference Paragraphs 1-49 of this First Amended Complaint.

-24-

56.     By virtue of the acts described above, United Technologies Corporations' Pratt & Whitney division knowingly made, used, or caused to be made or used false records or statements, such as DD Forms 633, Certificates of Current Cost or Pricing Data, , and BAFO Exhibit 3.8.1, to get false or fraudulent claims (*i.e.*, the invoices referred to in paragraph 52) paid or approved.

57.     The United States, unaware of the foregoing, and in reliance on the truth and accuracy of the records and statements, authorized payment of these claims and has been damaged in an amount to be proven at trial.

**Count III**
Contract Remedy

58.     This is an action brought by the United States against the defendant pursuant to common law under contract.

59.     Plaintiff re-alleges and incorporates by reference Paragraphs 1-49 of this First Amended Complaint.

60.     By virtue of the acts described above, United Technologies Corporation breached it's obligations when its Pratt & Whitney division failed to provide accurate, complete and current cost or pricing data during the negotiation of the Contract, and failed to adjust its AFE Contract prices to reflect the impact and effect on those prices of accurate, complete and current cost or pricing data.

61.     As a result, the United States has been damaged in an amount to be proven at trial.

**Count IV**

-25-

<u>Payment By Mistake</u>

62.     This is an action brought by the United States against the defendant pursuant to common law for payment by mistake of fact.

63.     Plaintiff re-alleges and incorporates by reference Paragraphs 1-49 of this First Amended Complaint.

64.     By virtue of the acts described above, the United States overpaid defendant under the AFE Contract under an erroneous belief that defendant had complied with the requirements of the Contract. This belief was material to the decision to pay. The United States' payment was by mistake and not authorized.

65.     Defendant benefitted from the United States' mistaken payment. The United States is entitled to recover such payment made by its mistake of fact.

66.     For its remedy, the United States seeks full restitution of the funds paid by mistake, its costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate.

**Count V**
<u>Unjust Enrichment</u>

67.     This a claim for the recovery of monies by which the defendant has been unjustly enriched.

68.     Plaintiff re-alleges and incorporates by reference Paragraphs 1-49 of this First Amended Complaint.

69.     By virtue of the acts described above, the United States overpaid defendant under the AFE Contract, and defendant was unjustly enriched thereby. Defendant is not entitled to retain such payment and/or benefits. In justice and equity, the payment and any other benefits

-26-

should be returned to the United States.

70.     For its remedy, the United States seeks full restitution of the payments and benefits by which defendants were unjustly enriched, its costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate.

## Relief

WHEREFORE, plaintiff demands judgment as follows:

1)     On Counts I and II, against the defendant for the applicable recovery under the FCA of plaintiff's treble damages, and all allowable civil penalties, post-judgment interest, fees, and costs;

2)     On Count III against the defendant in the amount of plaintiff's contract damages from Pratt's conduct as alleged, plus pre-judgment and post-judgment interest, fees and costs;

3)     On Count IV against the defendant in the amount that the United States mistakenly paid defendant under the Contract, plus pre-judgment and post-judgment interest, fees and costs;

4)     On Count V against the defendant in the amount of the benefit unjustly received by the defendant, plus pre-judgment and post-judgment interest, fees and costs;

5)     And all other relief as this Court may deem just and proper.

PETER D. KEISLER
Assistant Attorney General

GREGORY G. LOCKHART
United States Attorney

DALE A. GOLDBERG
PAMELA M. STANEK

Assistant United States Attorneys
200 West Second Street, 6th Floor
Dayton, OH  45402
Telephone:  (937) 225-2910

/S/ RICHARD G. VARTAIN
MICHAEL F. HERTZ
ALAN KLEINBURD
RICHARD G. VARTAIN
DENNIS PHILLIPS
ALAN S. GALE
Attorneys, Civil Division
U.S. Department of Justice
P.O. Box 261/Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 307-0195
Telecopy:    (202) 305-7797
E-Mail:        richard.vartain@usdoj.gov

<u>Certificate of Service</u>

       This is to certify that on December 18, 2004, I presented the forging to the Clerk of the Court for uploading to the CM/ECF system which will send notification of such filing  to David C. Greer, Esquire, and also e-mailed the same to Michael Valaik, Esquire.

                         <u>/S/ RICHARD G. VARTAIN</u>
                         MICHAEL F. HERTZ
                         ALAN KLEINBURD
                         RICHARD G. VARTAIN
                         DENNIS PHILLIPS
                         ALAN S. GALE
                         Attorneys, Civil Division
                         U.S. Department of Justice
                         P.O. Box 261/Ben Franklin Station
                         Washington, D.C.  20044
                         Telephone:  (202) 307-0195
                         Telecopy:    (202) 305-7797
                         E-Mail:      richard.vartain@usdoj.gov