# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

United States of America,

     *Plaintiff,*

v.              **Case No. 3:99-cv-093**
               **Judge Thomas M. Rose**

United Technologies Corporation,

     *Defendant.*

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

## I.  INTRODUCTION

  This action is before the Court on remand from the United States Court of Appeals for the Sixth Circuit. After a bench trial, this Court rejected Defendant United Technologies Corporation's assertion of a statute of limitations defense and found it liable on the United States' claims arising under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)&(2), ("FCA"). The Court found, *inter alia*, that United Technologies' predecessor in interest, Pratt and Whitney ("Pratt"), violated the False Claims Act by fraudulently asserting that its ceiling price quotes were decremented in Pratt's Best and Final Offer ("BAFO") Exhibit 3.8.1 on all sole-sourced vendors in an amount within the range established by Pratt's Procurement Cost Accounting Group ("PCAG") recommendations for each supplier and Pratt's past experience in achieving PCAG recommendations. The Court also found that Pratt and Whitney violated the False Claims Act by fraudulently asserting that the prices it

submitted were substantiated by the most recent data, and by fraudulently asserting that it applied the predicted domestic rate of inflation.  The Court also found that the Government suffered no actual damages in the years under review, and that the Government was precluded from pursuing common law claims. *Untied States v. United Technologies Corp.*, 2008 WL 3007997 (S.D. Ohio Aug. 1, 2008).  Both parties appealed this Court's decision.

The United States Court of Appeals for the Sixth Circuit affirmed the statute of limitations ruling and the ruling that Defendant had violated the False Claims Act, but found that the government's common law claims were not precluded by prior litigation before the ASBCA.  The Sixth Circuit disagreed with this Court's valuation of warranties, disallowed year-to-year off-sets to damages and ordered this Court to find and account for the fair market value of the engines the Air Force received when determining damages. *United States v. United Technologies Corp.*, 626 F.3d 313 (6th Cir. 2010).

The Court has since found United Technologies liable on the United States' claims for payment by mistake and unjust enrichment.  Thus, attention is now focused on determining the amount of damages.  Most particularly, the Court is focused upon three instructions from the Sixth Circuit: First, "[t]o calculate the difference between what the government paid and what it should have paid, [taking] account for the diminished value of the new warranties." 626 F.3d at 322. Second, to "calculate the difference between what the government paid each year–FEC III, IV, and V–and what it should have paid each year.."[1] *Id.*  Third, to "calculate what the government

---

[1] Since then this Court has found United Technologies liable under the common law, see ECF No. 425, the Sixth  Circuit's damages methodology will be extended to all six FEC years.

eventually paid each year during FEC III, IV, V, and VI, what it should have paid each year based on what the government received, then take the difference between the two." *Id.*

Familiarity with the factual background established in the prior ruling of this Court and that of the United States Court of Appeals for the Sixth Circuit is presumed. The Court bears in mind that "[d]amages awarded under the [FCA] typically are liberally calculated to ensure that they 'afford the government complete indemnity for the injuries done it.'" *United States ex. rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 304 (6th Cir. 1998)(quoting *United States ex. rel. Marcus v. Hess*, 317 U.S. 537, 549 (1943)).

## II.    FINDINGS OF FACT

The first step in this analysis is determining "what the government eventually paid each year." *Id.*  What the government eventually paid in each year of the Fighter Engine Contract ("FEC") for what it actually received is shown in Trial Ex. PX 1192, which includes a summary of what the  government's records showed it eventually paid in each FEC year, "that related directly to the specific contract modifications for the definitization of each of the engine buys (FECs I THRU VI). . . ." See Trial Ex. PX 1192 (summarizing by FEC year the total amounts paid for all engine funding "mods"); Tr: 4406:11-19.

In FEC I, the government eventually paid $423,416,265, in FEC II, the government eventually paid $586,187,736, in FEC III $574,371,030, in FEC IV $632,957,656, in FEC V, $579,293,580, and in FEC VI $387,385,038. PX 1192.

As to what the government "should have paid," 626 F.3d at 322, United Technologies continues to assert that what the government actually paid is what it should have paid. United Technologies proposes that historical prices, comparable sales, independent price appraisals and

market prices establish fair market value. The historical prices, comparable sales, and independent price appraisals, however, are derived from cost data that are older, and more out of date than the cost data the United States uses to calculate damages. Indeed, it appears that these prices are higher because they derive from a time prior to when the Air Force moved away from single source jet engine procurements to force prices down.

Independent estimates such as the DCAA audit and Rand study were based on United Technologies's costs on earlier sole-sourced procurements. "Even though our team was called the independent team and independent estimates,...the independence was not necessarily independent from Pratt [and] Whitney...data but in fact we needed to use the same data Pratt and Whitney used..." Tr. 593:9-18. Even DX 131, described the "independent estimates as a detailed cost estimate based on actual cost data," DX 131 at D0000345, lists the various cost elements that went into the estimate, *id.* at D0000345-350 and states that in addition to historical costs, United Technologies's proposed Increased Life Core Digital Electronic Engine Control costs for the new engine configuration were included in the estimate to which United Technologies added a 25% cushion. Similarly, the Rand study was based on cost data from prior United Technologies and GE engines. Tr. at 597:9 – 598:9.

United Technologies also advocates applying deference recognized in *Chevron U.S.A. Inc., v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984), to the opinions of Air Force procurement experts regarding the engines' value, failing to establish any of the predicates that would warrant *Chevron* deference. Moreover, while United Technologies is correct that an Air Force report to Congress that the fighter engine competition was "One of the best examples" of

dual-sourced competition stands "unrebutted, unimpeached and unmentioned by Plaintiff," this Court has found the government a victim of a fraud that lead to that belief.

Finally, United Technologies asserts that the negotiated prices of their Pratt and Whitney engines and General Electric's engines should be evidence of the value of the engines, relying upon *Northrop Corp., v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1055-56 (9th Cir. 1983). *Northrop*, however, is both distinguishable and inapposite, as it involved multiple buyers, and stands for the proposition that a market with only two sellers is not thereby beyond the reach of antitrust laws.

The instant case involves a market with only two sellers and one buyer.[2] One of the sellers has been found to be fraudulently declaring its costs and the other has been expressly invited to enter the market to create competition and increase the country's military readiness. Moreover, the comparable sales approach is inapplicable to a thing "seldom if ever sold in the open market." *United States v. 50 Acres of Land*, 469 U.S. 24, 30 (1984). It is pure speculation what these engines might fetch in an open market. United Technologies has not proven what the amount would be. What has been proven is that United Technologies and the Air Force agreed they were worth the cost of the parts plus a fixed profit. The Supreme Court has recognized that, when a party chooses to participate in a government-regulated market, the regulated process "represented not only the market value but in fact the only value that could be realized." *United States v. Commodities Trading Corp.*, 339 U.S. 121, 124 (1950). In the end, the Court cannot find that either producers' prices are reflective of fair market value, as the one was the product of fraud and the other reflects costs entailed in market entry.

---

[2] Were the market expanded beyond one buyer, *i.e.*, if the engines were auctioned at an open market in each FEC year, international bidding would likely have established a fair market value above what the government paid.

Thus, the Court adopts the testimony of government expert Dannie Zacheretti, who testified that the Court should adjust what the government eventually paid in each contract year by removing the amounts the government proved it paid as a result of United Technologies' fraud in each FEC year and add in any amounts United Technologies proved in that FEC year as an offset. Cf. *County of Oakland by Kuhn v. Vista Disposal, Inc.*, 900 F. Supp. 879, 887 (E.D. Mich. 1995) ("The court finds that the closest approximation of a fair market price in this action is the sum of a receiver's costs...plus a reasonable measure of a profit on these costs....").

The government should not have paid the amounts that the government proved it paid as a direct result of United Technologies' fraud. At trial, Zacheretti calculated that the inflated amounts included in the final engine prices for all engine equivalents in FEC I was $23,762,721, (5824:10-12); in FEC II $38,972,249, (5824:18-20, 5931:20-21), in FEC III $41,109,235, (5825:8-11; 5911:22-23), in FEC IV, $ 5,149,938 prior to March 3, 1989,[3] (5825:16 to 5826:4), and $42,418,158 after March 3, 1989, (5826:8-14), in FEC V $44,787,060, (5826:19-22), and in FEC VI $31,781,617. (5827:8-11). It is beyond cavil that the government would have paid less for the engines than it did, absent Pratt's fraud. The Court presumes that the amount overpaid is equal to the fraudulent amount quoted, absent evidence to rebut that. United Technologies has presented no evidence to rebut the presumption. While the prices eventually paid were not governed by the cost-plus-profit regulations under which the DS 633s were produced, they certainly derive from the regulatory system. These prices being derived from the regulatory system means they cannot be described as an arms-length transaction. The Court again notes that, had these engines been in a

---

[3] The government has elected damages for payment by mistake and unjust enrichment prior to March 3, 1989, the date the statute of limitations limits additional such damages, and False Claim Act damages thereafter.

truly unregulated market, if they were auctioned to any interested entity, their fair market value would likely have been considerably beyond what the government actually paid.

The Court adjusts the amounts the government eventually over paid by subtracting the amounts of any underestimates United Technologies can prove. United Technologies claimed that it underestimated costs related to an Engineering Change Proposal for a section of the engine known as the Increased Life Core, meaning that United Technologies canceled too much labor and material, thus underestimating its cost. United Technologies, however, offered no expert testimony to support any such underestimate.

Zacheretti testified that the Increased Life Core Engineering Change Proposal created a net difference between the canceled labor and material and the added labor and material for the Increased Life Core and that while United Technologies was claiming it had removed too much value on the canceled side of the equation, the data needed to verify the amount of added labor and material on the other side of that same equation had never been produced by United Technologies despite multiple requests by the government that United Technologies produce the data. Tr. at 5555:16 to 5557:2. Accordingly, Zacheretti testified that it was impossible to verify whether the Increased Life Core Engineering Change Proposal was too high or too low. Tr. at 5556:16-20; 5558:13 to 5559:5; 5562:23 to 5574:2.

Additionally, Zacheretti testified that just by looking at the document United Technologies purports shows the difference between the canceled labor and material and the added labor and material for the Increased Life Core, there were inconsistencies where the exact same items were canceled and added at different values and other oddities that made no sense to him as an auditor. Tr. at 5557:3-11. United Technologies offered no expert testimony to contradict Zacheretti's expert

opinions that the existence or amount of an underestimate (or overestimate) could not be verified in the absence of the missing data or that the document contained flaws that made it unreliable.

United Technologies also claimed an offset related to an engine part it accidentally deleted twice in an Engineering Change Proposal, part number 4058553. Zacheretti credibly testified that he corrected this mistake when arriving at his calculations of the amount United Technologies overcharged the government, reducing the amount of the government's damages. Tr. 5549:18-24; 6169:20-6170:11. Since the government's damages calculation already credits United Technologies for this underestimate, it cannot be used to further reduce the government's damages.

Untied Technologies also protests that the DCAA concluded that Pratt and Whitney underpriced Rohr part number 4053954 by $10,705,549 for the fighter engine competition. The DCAA, however, reached this result by utilizing a decrement factor that the Court has previously found to be the result of fraud. The Court chooses to follow the calculation of Zacheretti, which used the most current data, the method Pratt and Whitney claimed to use in its BAFO.

Next, United Technologies claims that Zacheretti did not deduct $22,859 per engine of Improved Life Core material overpricing found by DCAA. The DCAA, however, qualified its finding, noting that United Technologies failed to provide the documents necessary to analyze the base year Improved Life Core Engineering Change Proposal added parts and labor. Thus, DCAA's Improved Life Core findings on this point were not performed in accordance with general accepted government accounting standards, and the DCAA findings were qualified. Indeed, the DCAA reports admitted the possibility that labor costs were not understated, but overstated. DX 515 at 54; DX 515 at 53. In sum, United Technologies failed to prove any Improved Life Core Engineering Change Proposal labor offset, because it is impossible to determine whether the Improved Life Core

Engineering Change Proposal labor was underestimated, overestimated or correct without the add labor support documentation. There is no entitlement to an offset where "[t]he evidence in support of the offset claim was confusing and inconsistent such that the [finder of fact] would have to speculate in order to determine the proper amount of offset." *Bryan Co., Inc. v. U.S. Surgical*, 150 Fed. App'x 616, 618 (9th Cir. 2005).

Similarly, United Technologies did not produce the data necessary to determine if the Improved Life Core Engineering Change proposal resulted in a difference in material costs that were overstated or understated. Tr. 5555:16 – 5557:2.

United Technologies also complains of being forced to follow Air Force regulations to modify its BAFO to exclude profit from its Economic Price Adjustment. While United Technologies protests that this increased the amount of damages, this ignores that the regulations establish fair market value for the parts that United Technologies misquoted to the Air Force. Following them was appropriate. Had United Technologies followed the regulations throughout the process, there would have been no fraud and no damages.

United Technologies also protests that the damages reflect amounts paid based upon estimated inflationary increases, or Economic Price Adjustments. The Air Force rejected Pratt's proposed Firm Fixed Prices, wrongly assuming the inflation would continue to rage. In effect, United Technologies complains that the Air Force failed to mitigate damages on Pratt's fraud by guessing wrongly about future inflation. United Technologies does not cite authority for reducing damages due to failure to mitigate due to failing to perceive the future. The case law is to the contrary. "The Government has no duty to mitigate damages in fraud actions, including those under the FCA." *United States ex rel. Monahan v. Robert Wood Johnson University Hosp. at Hamilton*,

2009 WL 4576097, 8 (D.N.J. 2009); see also *Toepleman v. United States*, 263 F.2d 697, 700-01 (4th Cir. 1959) ("The fraud was the effecting cause of the loss, the drop in the market a foreseeable incident.") Moreover, even if there was a duty, that duty would not attach until the injured party knows that they have been damaged by tortious conduct. *Alliant Tax Credit Fund 31-A, Ltd v. Murphy*, 494 Fed. App'x 561, 573 (6th Cir. 2012).

United Technologies has not established an underestimate. Not only did United Technologies fail to provide evidence that it actually had made an underestimate in the Increased Life Core Engineering Change Proposal, but the government showed that the proposed offsets would be speculative since it would be based on a document that was wrong on its face and that had been rendered unverifiable and un-auditable by United Technologies' failure to preserve or produce the records needed to prove or disprove either the existence or amount of the underestimate. Thus, United Technologies is not entitled to an offset. See *Elyria-Lorain Broadcasting Co. v. Lorain Journal Co.*, 358 F.2d 790, 793 (6th Cir. 1966) (in calculating damages, "[t]he wrongdoer should bear the risk of the uncertainty which his own wrong has created") citing *Bigelow v. RKO Radio-Pictures, Inc.*, 327 U.S. 251 (1945); *Bryan Co. v. United States Surgical*, 150 Fed. App'x 616, 618 (9th Cir. Sept. 16, 2005) (defendant was not entitled to offset where evidence in support of the offset was inadequate and conflicting and would have required the fact finder "to speculate in order to determine the proper amount of offset"); *Grupo Condumex, S.A. v. SPX Corp.*, 2008 WL 4372678 at *8 (N.D. Ohio Sept. 19, 2008) ("Courts generally decline to engage in such speculation when offsetting benefits against damages").

Having established what the government eventually paid for the engines, the amounts by which government overpaid for the engines due to fraud and the absence of offsets based on engine

savings and underestimates, the Court can determine that in FEC I the government eventually paid $423,416,265, of which $23,762,721 was attributable to fraud, meaning that the fair market value the government should have paid was $399,653,544 in FEC I.    In FEC II, the government eventually paid $586,187,736, of which $38,972,249 was attributable to fraud, meaning that the fair market value the government should have paid was only $547,215,487.  In FEC III, the government eventually paid $574,371,030, of which $41,109,235 was attributable to fraud, meaning that the fair market value the government should have paid was only $533,261,795.  In FEC IV, the government eventually paid $632,957,656, of which $47,568,096 was attributable to fraud, meaning that the fair market value the government should have paid was only $585,389,560.  In FEC V, the government eventually paid $579,293,580, of which $44,787,060 was attributable to fraud, meaning that the fair market value the government should have paid was only $534,506,520.  In FEC VI, the government eventually paid $387,385,038, of which $31,781,617 was attributable to fraud, meaning that the fair market value the government should have paid was only $355,603,421.  Subtracting the fair market value amount that should have been paid each year from the amount eventually paid each year and aggregating the total amount of damages yields a sum of $227,980,978.  This amount "accurately represent[s] the difference between what the government actually paid to [the defendant] and the payments to which [the defendant] would have been entitled in the absence of its fraud." *United States ex rel. Wall v. Circle C Const., L.L.C.*, 697 F.3d 345, 359 (6th Cir. 2012).

Next, the Court must determine by what amount, if any, the total amount of damages should be reduced by reductions in the price of the warranty on the engines.  United Technologies seeks an offset for the difference between the price the government would have paid for the unlimited warranty United Technologies originally proposed and the price the government eventually paid for

the limited warranty the government actually received. United Technologies asserts that the limited warranty was equal in value to the unlimited warranty, citing to the Court evidence upon which the Court had previously relied in adopting United Technologies' position. The Court of Appeals rejected this approach, ordering the Court to calculate the difference, if any, between what the government paid and what it should have paid for the reduced warranties, ordering this Court to "account for the diminished value of the new warranties." 626 F.3d at 322. Discounting the evidence the Court relied upon to reach its previous decision, the Court is left with the evidence pointing to the other extreme, as the Air Force found that, while GE's "liability cap represents a cost effective approach to risk sharing," DX 124 at 7000940, United Technologies's higher warranty prices were warranted because, "If a contractor is asked to assume a very large liability, he is going to protect himself in terms of charging or assessing a large cost for the warranty." DX 19 at 237. Thus, the Court finds that the government paid exactly what it should have paid for the reduced warranties. The warranties were never subject to the government cost and profit regulations, leaving it in a realm more familiar to this Court: the free market. Here "[f]air market value is ... the price that a willing buyer and a willing seller would agree to in an arm's length transaction." *American Soc. of Composers, Authors and Publishers v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 569 (2d Cir. 1990). Prices arrived at through arms-length negotiations are competent objective evidence by which the trier of fact can reasonably determine that the prices were the "value" of the item sold. *United States v. Lehning*, 742 F.2d 1113, 1115 (7th Cir. 1984). See also *A & B Steel Shearing & Processing, Inc. v. United States*, 934 F. Supp. 254, 257-58 (E.D. Mich. 1996) ("[O]ne acceptable measure of the value... is a price agreed upon between parties engaged in a bona-fide, arms-length negotiation."). "When a willing seller and a willing buyer agree and fix

-12-

the price of an article, it is obvious that it is reasonable to infer that such estimation approximates

closely to the real value of such article...." *In re McAusland*, 235 F. 173, 190 (D.N.J. 1916).  Noting

that the warranties were not subject to the same cost plus profit declaration requirements entailed

in the DD 633, the Court finds that the value of the warranties was the price negotiated for them at

arm's length between United Technologies and the government.  United Technologies, thus, receives

no damage offset for the reductions in the price of the warranties.[4]

Thus, the Court will proceed to calculate the prejudgment interest on the government's

common law damages.  As previously stated, the government's common law damages in FEC I, II

and III are $23,762,721, $38,972,249 and $41,109,235.  Common law damages for the portion of

FEC IV not covered by the government's False Claims Act damages, those paid before March 3,

1989, are $5,149,938. Tr. at 5825:16 to 5826:4.

In the Sixth Circuit, the rate of prejudgment interest is left to the sound discretion of the

trial court, *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998), but should be neither

punitive nor so low that it "fails to make the plaintiff whole by inadequately compensating him or

her for the lost use of money." *Id.* at 618.

United Technologies opposes the imposition of prejudgment interest, asserting that it is

inapplicable to contract debts.  United Technologies' position ignores that these debts were not

contractual, but rather the result of unjust enrichment and payment by mistake.

The government requests that the Court calculate prejudgment interest according to the

Current   Value   of   Funds   Rate   interest   rates   published   by   the   Treasury.   See

---

[4]United Technologies also protests the warranty price reductions should be applied before the
damage award is tripled.  While this question is moot, the caselaw is clear that damages are tripled
before offsets are applied.

http://www.fms.treas.gov/cvfr/index.html. The Current Value of Funds Rate is the interest rate federal agencies must charge on debts and is established at the outset and is not subject to change during the life of the debt. 31 C.F.R. § 901.9(b)(3). Using the Current Value of Funds Rate has been held to be an appropriate prejudgment interest rate on government common law claims for payment by mistake and unjust enrichment. *United States ex rel. Zissler v. Regents of Univ. of Minnesota*, 1998 WL 2026226 at *5-7 (D. Minn. June 1, 1998). United Technologies, while opposing the imposition of prejudgment interest, has not opposed this manner of computing the interest.

For the sake of simplicity for each FEC year, the Court will calculate prejudgment interest for each FEC year from the date representing the median date of payment for all invoices that are subject to the government's common law claims within each FEC year, as reflected by Trial Ex. PX 400.[5]

The end date for the calculation of prejudgment interest will be the date the Court will actually enter judgment, July 1, 2013. Thus, for FEC I, in which the government incurred $23,762,721 in common law damages, accruing from November 26, 1986, interest will be calculated at a rate of 8% a year. For FEC II, in which the government incurred $38,972,249 in common law damages, accruing from May 14, 1987, interest will be calculated at a rate of 7% a year. In FEC III, in which the government incurred $41,109,235 in common law damages, accruing from June 10, 1988, interest will be calculated at the rate of 6% a year. In FEC IV in which the government incurred $5,149,938 in damages, accruing from February 10, 1989, interest will be calculated at a

---

[5] This method was proposed by the government and unopposed by United Technologies.

rate of 6% a year.  The government will submit a calculation of prejudgement interest using these inputs determining accrued interest through July 1, 2013.

For damages incurred on or after March 3, 1989, the government has waived common law damages and prejudgment interest, and elected its False Claims Act remedy of treble damages plus penalties for damages incurred on or after March 3, 1989.  The "liability under the False Claims Act is triple the amount of actual damages suffered by the United States, plus a 'civil penalty' of $5,000 to $10,000 for each violation." 31 U.S.C.A. § 3729(a)(1).  The government's False Claims Act damages are the damages attributable to claims  paid on or after March 3, 1989, part way through FEC IV.  See Trial Ex. PX 400.  According to Zacheretti's testimony, which the Court finds credible, the portion of damages in FEC IV that is attributable to invoices paid on or after March 3, 1989 is $42,418,158. Tr. at 5826:8-14.  All claims paid in FEC V and VI were paid after March 3, 1989, see Trial Ex. PX 400, and, accordingly, all damages in FEC V and FEC VI are subject to trebling.  Finally, the government is entitled to recover the False Claims Act penalties previously found by this Court and affirmed by the Sixth Circuit.  Accordingly, the $42,418,158 damages for FEC IV invoices paid on or after March 3, 1989 are trebled to $127,254,474.  Similarly, the FEC V damages of $44,787,060 are trebled to $134,361,180, and the FEC VI damages of $31,781,617 are trebled to $95,344,85.  Additionally, as already determined by this Court and affirmed by the Sixth Circuit, the government is entitled to penalties of $7,090,000.  Thus, for claims under the False Claims Act, the government is entitled to treble damages and penalties of $364,050,505.[6]

---

[6] Motions have been made in the parties filings to admit into evidence DX 516, DX 518 and  PX 460A. All of these documents constitute hearsay.  They are admitted into evidence only to provide context for testimony at trial, not for the truth of the matters asserted in them.  See *Paddack v. Dave Christensen, Inc*., 745 F.2d 1254, 1261-62 (9th Cir. 1984), and *Nachtsheim v. Beech Aircraft Corp.*,847 F.2d 1261, 1270-71 (7th Cir. 1988).

**III.     Conclusion**

Thus, the government is awarded $23,762,721 in common law damages for FEC I, plus interest accruing from November 26, 1986 at a rate of 8% a year.  The government is awarded $38,972,249 in common law damages for FEC II, plus interest accruing from May 14, 1987 at a rate of 7% a year.  The government is awarded $41,109,235 in common law damages for FEC III plus interest accruing from June 10, 1988 at the rate of 6% a year. The government is awarded $5,149,938 in common law damages for FEC IV prior to March 3, 1989, plus interest accruing from February 10, 1989 at a rate of 6% a year.

The government is also awarded damages trebled to $127,254,474 for FEC IV False Claims Act damages after March 3, 1989.  The government is awarded damages trebled to $134,361,180. for FEC V.  The government is awarded damages trebled to $95,344,85 for FEC VI.  Additionally, the government is awarded penalties of $7,090,000.

The government is **ORDERED** to submit a draft judgement entry with a calculation of prejudgement interest using these inputs determining accrued interest through July 1, 2013.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, June 17, 2013.

s/Thomas M. Rose

_____

THOMAS M. ROSE

UNITED STATES DISTRICT JUDGE